# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40215**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Brian W. ALTON**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 28 April 2023

———————————

*Military Judge:* Christina M. Jimenez.

*Sentence:* Sentence adjudged on 28 July 2021 by GCM convened at Creech Air Force Base, Nevada. Sentence entered by military judge on 1 September 2021: Dishonorable discharge, confinement for 14 years, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Eshawn R. Rawlley, USAF; Catherine M. Cherkasky, Esquire.

*For Appellee:* Lieutenant Colonel Thomas J. Alford, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major John P. Patera, USAF; Major Brittany M. Speirs, USAF; Captain Olivia B. Hoff, USAF; Captain Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before JOHNSON, ANNEXSTAD, and GRUEN, *Appellate Military Judges.*

Chief Judge JOHNSON delivered the opinion of the court, in which Judge ANNEXSTAD and Judge GRUEN joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

JOHNSON, Chief Judge:

The military judge found Appellant guilty, in accordance with his pleas, of one specification of conspiracy to obstruct justice and two specifications of obstructing justice in violation of Articles 81 and 131b, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 931b. A general court-martial composed of officer and enlisted members found Appellant guilty, contrary to his pleas, of one specification of wrongfully leaving the scene of an accident, one specification of drunken operation of a vehicle resulting in injury, one specification of drunken operation of a vehicle not resulting in injury, and one specification of involuntary manslaughter, in violation of Articles 111, 113, and 119, UCMJ, 10 U.S.C. §§ 911, 913, 919. Appellant elected to be sentenced by the military judge, who imposed a dishonorable discharge, confinement for 14 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority took no action on the sentence.

Appellant raises five issues for our review: (1) whether the court-martial lacked jurisdiction over Appellant; (2) whether the military judge abused her discretion by allowing the court members to receive certain testimony from a government expert witness; (3) whether the findings of guilty with respect to the contested charges and specifications are legally and factually sufficient; (4) whether the military judge abused her discretion by declining to instruct the court members that a guilty verdict must be unanimous; and (5) whether Appellant's sentence is inappropriately severe. We have carefully considered issue (4) and find it does not require discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). As to the remaining issues, we find no material prejudice to Appellant's substantial rights, and we affirm the findings and sentence.

## I. BACKGROUND

In May 2019, Appellant was stationed at Creech Air Force Base (AFB), Nevada, and lived in Las Vegas, Nevada. On the night of 2 May 2019, after Appellant completed work for the day he drove his pickup truck to the apartment of his friend Airman First Class (A1C) WM.[1] Appellant then drove himself and A1C WM to a bar approximately two miles from Appellant's house, arriving shortly before midnight. Appellant and A1C WM were recorded by security video cameras inside the bar. Between midnight and 0411, Appellant

---

[1] A1C WM was charged and sentenced by a general court-martial for his actions on 3 May 2019. *See United States v. Marable*, No. ACM 39954, 2021 CCA LEXIS 662 (A.F. Ct. Crim. App. 10 Dec. 2021) (unpub. op.), *rev. denied*, No. 22-0107, 2022 CAAF LEXIS 244 (C.A.A.F. 29 Mar. 2022). A1C WM was an airman basic at the time of Appellant's trial.

consumed two 12-ounce beers, three 16-ounce beers, four shots of liquor, and two alcoholic mixed drinks; A1C WM consumed a similar amount of alcohol. At 0411, Appellant and A1C WM departed the bar and entered Appellant's truck, and Appellant began driving to his house.

A1C WM later described himself as "pretty intoxicated" at that point, and he was "kind of just like in and out of being conscious" as he rode in Appellant's truck. During the drive A1C WM heard Appellant say that Appellant might have hit someone. However, Appellant did not stop and continued to drive to his house, where Appellant backed into his driveway at approximately 0415.

Appellant and A1C WM got out of the truck and inspected the front of the vehicle. Among other damage, they found the driver's side (left) headlight assembly was gone and the left front bumper was significantly bent, and there was blood on the front of the truck. Appellant attempted to clean the blood off the truck with a rag and spray bottle.

Appellant and A1C WM then decided to walk back to the scene of the accident because they were concerned debris from Appellant's truck at the scene would link them to the accident. They walked approximately two blocks back to the scene of the accident where they found the body of FM lying at the side of the street. FM was a retired Army sergeant major who lived nearby and exercised early most mornings by walking around the neighborhood. FM had been struck near the middle of the crosswalk across the four-lane road; his body had been knocked approximately 130 feet from the point of impact, and he had been killed almost instantly. FM's right leg had been severed at the hip and had come to rest some distance away from the rest of the body. Pieces of debris from Appellant's truck lay scattered in the street. Appellant and A1C WM began picking up pieces from the truck; they intended to dispose of the pieces in order to conceal their involvement.

An unidentified bicyclist approached the intersection while Appellant and A1C WM were there, which prompted them to hide the truck pieces they had gathered in nearby bushes. Another bicyclist, JT, also arrived. Appellant and A1C WM claimed they were walking home from a bar when they discovered FM's body. In order to encourage the bicyclists to leave, A1C WM told them he and Appellant would call the emergency services to the scene; after his assurances, the bicyclists departed. Appellant and A1C WM then continued collecting truck pieces, which they carried back to Appellant's house.

At Appellant's house, they placed the pieces in Appellant's girlfriend's vehicle. Appellant then drove that vehicle, accompanied by A1C WM, approximately 10 to 15 minutes to an uninhabited area and threw the pieces "into the desert" so they would not be found. Appellant and A1C WM then drove back to Appellant's house, arriving at approximately 0535. A1C WM went inside

Appellant's house to the guest room to sleep. After parking his girlfriend's vehicle, Appellant moved his damaged truck from his driveway to the side of the street across from his house before he, too, went inside. Unknown to Appellant, some of his movements in front of his house that morning were recorded on the motion-activated security camera of a neighbor across the street.

In the meantime, after the bicyclist JT departed the scene of the accident he rode approximately two blocks to a location where he knew police were often stationed, but he found no one there. JT then rode back to the scene of the accident and was surprised to find it deserted with FM's body still lying at the side of the road. JT called the Las Vegas police and waited at the scene until they arrived.

When the police arrived, they could tell from the remaining debris in the street that FM had been struck by a vehicle traveling in a particular direction that must have suffered significant damage. The police searched the surrounding area and found Appellant's damaged truck parked across the street from his house. The police identified Appellant as the owner of the truck. When the police spoke with Appellant that morning, Appellant told them—among other things—that he had left his truck parked in his driveway, that he did not know how his truck came to be parked across the street, and that he had not been at the bar the night before.

Appellant's blood was drawn at 1041 and again at 1142 that morning to test its alcohol content. The 1041 sample indicated a blood alcohol content (BAC) of 0.029 grams of alcohol per 100 milliliters of blood. The 1142 sample indicated a BAC of between 0.010 and 0.020 grams; however, no specific concentration was indicated for this sample because the policy of the Las Vegas Metropolitan Police Department Toxicology Lab treated results in that range as "not quantifiable."

Appellant ultimately pleaded guilty to the following offenses: conspiring with A1C WM to obstruct justice; obstructing justice by removing pieces of his truck from the scene of the accident and discarding them; and obstructing justice by making false statements to law enforcement. Appellant pleaded not guilty but was found guilty of the following offenses: wrongfully leaving the scene of an accident without providing assistance to FM; physically controlling his truck while drunk and causing physical injury to FM; physically controlling his girlfriend's vehicle while drunk; and involuntary manslaughter by striking FM with a vehicle in a culpably negligent manner.

## II. DISCUSSION

### A. Jurisdiction

#### 1. Additional Background

During the initial session of Appellant's court-martial on 6 June 2021, the military judge noted the charge sheet indicated Appellant's term of service had been due to expire on 26 November 2018. When the military judge asked trial counsel if Appellant was still on active duty, trial counsel responded that Appellant "ha[d] been extended through extensions and orders and his service," and had been continued on active duty through administrative hold. The military judge asked the Defense if there were "any concerns with [Appellant's] service at this point in time?" Trial defense counsel responded, "No, Your Honor." Appellant did not challenge the court-martial's jurisdiction over him during the trial or in his post-trial submissions to the convening authority.

On appeal, Appellant does challenge the court-martial's jurisdiction over him. Appellant moved to attach several documents to the record related to the asserted absence of jurisdiction, including a declaration by Appellant; a copy of a Department of Defense Form 214 (DD Form 214)[2] indicating Appellant had a separation date of 3 March 2020; a series of email communications between Appellant's defense counsel, his first sergeant, the Creech AFB office of the staff judge advocate (legal office), finance personnel, and others regarding Appellant's pay situation; and a printout of Appellant's "W-2 [Tax] Information" for tax year 2021. Over the Government's objection, this court granted the motion to attach while "specifically defer[ring] consideration of the applicability of *United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020)," until the completion of our review pursuant to Article 66, UCMJ, 10 U.S.C. § 866. The Government then moved to attach a declaration from Captain MT, the Chief of Military Justice at Creech AFB, with 13 attachments, which this court also granted.

Collectively, the matters attached by the parties indicate the following: on the date of Appellant's offenses, 3 May 2019, Appellant had already exceeded his initial six-year term of service and for unrelated (not misconduct-related) reasons had been extended until late November 2019. After the Air Force obtained jurisdiction over Appellant's offenses from civilian authorities in August 2019, Appellant was informed by his leadership he would be continued on administrative hold and not allowed to separate during the investigation. When Appellant received no official notification of his extension before his previously scheduled separation date arrived, he notified the Air Force Personnel Center

---

[2] Department of Defense Form 214, *Certificate of Release or Discharge from Active Duty* (Aug. 2009).

of his intention to separate. He received, completed, and submitted a "DD[ ]214 worksheet," and subsequently received a DD Form 214 indicating a separation date of 3 March 2020.

Meanwhile, on 21 June 2019 the legal office had submitted a request to the local force support squadron to administratively hold Appellant on active duty for 180 days. Between 21 June 2019 and 15 June 2021, the legal office submitted a total of 11 requests to Air Force military personnel offices, often overlapping, to extend Appellant on active duty for 90 or 180 days at a time. Throughout this time, Appellant continued to report for duty and did not complete all applicable out-processing requirements at the relevant offices on Creech AFB.

During this period, Appellant experienced several interruptions in receiving his Air Force pay. On some occasions he would receive no payment during a particular pay period. Appellant's trial defense counsel and defense paralegal, his first sergeant, legal office personnel, and others repeatedly communicated about the interruptions in Appellant's pay; there was general agreement among these individuals that Appellant should be receiving pay. In some cases, Appellant was paid with a physical check issued by finance personnel.

**2. Law**

We review questions of court-martial jurisdiction de novo. *United States v. Hale*, 78 M.J. 268, 270 (C.A.A.F. 2019) (citing *EV v. United States*, 75 M.J. 331, 333 (C.A.A.F. 2016)). Challenges to jurisdiction not raised at trial are not waived and may be raised for the first time on appeal. *See* Rule for Courts-Martial (R.C.M.) 907(b)(1); *United States v. Reid*, 46 M.J. 236, 240 (C.A.A.F. 1997).

"Generally, there are three prerequisites that must be met for courts-martial jurisdiction to vest: (1) jurisdiction over the offense, (2) jurisdiction over the accused, and (3) a properly convened and composed court-martial." *United States v. Ali*, 71 M.J. 256, 261 (C.A.A.F. 2012) (citing Rule for Courts-Martial (R.C.M.) 201(b); *United States v. Harmon*, 63 M.J. 98, 101 (C.A.A.F. 2006)). Jurisdiction over an accused is lost upon discharge from the service, but "the UCMJ does not state when a servicemember's discharge from the armed forces becomes effective for jurisdictional purposes." *United States v. Christensen*, 78 M.J. 1, 4 (C.A.A.F. 2018). The United States Court of Appeals for the Armed Forces (CAAF) "has identified three criteria to consider when determining whether a servicemember's discharge has been finalized for jurisdictional purposes: (1) the delivery of a discharge certificate (a DD Form 214); (2) a 'final accounting of pay'; and (3) the completion of the 'clearing' process that is required under service regulations." *Id.* (quoting *United States v. Hart*, 66 M.J. 273, 276–79 (C.A.A.F. 2008)). However, this guidance is not binding when it goes "against reason or policy." *Id.* at 5. (quoting *United States v. Nettles*, 74

M.J. 289, 291 (C.A.A.F. 2015)). "[I]f one or more of these criteria have not been fully met, then the military trial judge must consider the totality of the circumstances in making a jurisdictional determination." *Id.* at 5 n.6 (citing *Nettles*, 74 M.J. at 291).

### 3. Analysis

Appellant contends the court-martial lacked *in personam* jurisdiction over him due to the Government's failure to properly retain him on active duty after the expiration of his term of service. The Government responds that in light of applicable CAAF precedent, Appellant was never finally discharged from the Air Force and therefore was subject to the court-martial's jurisdiction. However, as an initial matter, the Government also contends the CAAF's decision in *Jessie* precludes our consideration of the matters Appellant moved to attach on appeal and relies on for his argument. Accordingly, we address this question first.

### a. *Application of* United States v. Jessie

In *Jessie*, the CAAF explained that, in general, the Courts of Criminal Appeals (CCAs) "may not consider anything outside of the 'entire record' when reviewing a sentence under Article 66(c), UCMJ[, 10 U.S.C. § 866(c)]." 79 M.J. at 441 (citation omitted). The CAAF defined the "entire record" to include the "record of trial," "matters attached to the record" pursuant to the Rules for Courts-Martial (formerly known as "allied papers"), and "briefs and arguments that government and defense counsel (and the appellant personally) might present regarding matters in the record of trial and 'allied papers.'" *Id.* at 440–41 (citations omitted). However, the CAAF identified two exceptions to this general rule. First, the CAAF acknowledged certain precedents had "allowed the CCAs to supplement the record . . . when necessary for resolving claims of ineffective assistance of trial defense counsel and a wide variety of other issues when those claims and issues are raised by the record but are not fully resolvable by the materials in the record." *Id.* at 442 (citations omitted). Second, other CAAF precedents have "allowed appellants to raise and present evidence of claims of cruel and unusual punishment and violations of Article 55, UCMJ, [10 U.S.C. § 855, or the Eighth Amendment[3],] even though there was nothing in the record regarding those claims." *Id.* at 444 (citations omitted).

Appellant's argument that the court-martial lacked jurisdiction over him implicates *Jessie* because it relies on matters outside the "entire record" as defined by the CAAF. The CAAF has yet to interpret the application to *Jessie* in a situation such as this. However, in two recent opinions addressing analogous situations implicating *Jessie* this court presumed for purposes of analysis that

---

[3] U.S. Const. amend. VIII.

we could consider the material offered by the parties on appeal. *See United States v. Rodriguez*, No. ACM 40218, 2023 CCA LEXIS 125, at *11 (A.F. Ct. Crim. App. 9 Mar. 2023) (unpub. op.) (addressing alleged disqualification of military judge); *United States v. Brissa*, No. ACM 40206, 2023 CCA LEXIS 97, at *10 (A.F. Ct. Crim. App. 27 Feb. 2023) (unpub. op.) (addressing allegedly unqualified assistant trial counsel). In those cases we found it appropriate to consider the additional matter because, *inter alia*: statements by the military judge and counsel arguably "raised" the issue of their ability to serve in their respective roles; the raised issues were significant to the integrity of the military justice system, inclining the court to err on the side of ensuring fair proceedings; and our consideration of the matters did not unfairly prejudice the Government because we found the appellants were not entitled to relief on the merits of the issues raised. We find similar considerations weigh in favor of considering the matters presented by the parties in the instant case. Moreover, we note the CAAF recently took a similar approach in *United States v. Behunin*, albeit without explicitly referring to *Jessie*, when it declined to decide the second of two granted issues, "Whether extra-record results of other courts-martial that were not part of the record of trial before Appellant's case was docketed at the CCA may be considered during its Article 66, UCMJ, review." ___ M.J. ___, No. 22-0276, 2023 CAAF LEXIS 163, at *6 (C.A.A.F. 21 Mar. 2023). The CAAF explained it could "dispositively decide the first [granted] issue by simply assuming without deciding that the CCA properly considered [the] entry of judgment" from a separate court-martial. *Id.*

Accordingly, we presume for purposes of our analysis that we may consider the matters attached to the record by the parties on appeal.

### b. Personal Jurisdiction

Turning to the issue Appellant has raised, we conclude Appellant was not effectively discharged from the Air Force for purposes of court-martial jurisdiction. Beginning with the three criteria the CAAF identified for analyzing questions of jurisdiction, we acknowledge Appellant's receipt of an apparently complete DD Form 214 weighs in his favor. However, the totality of the circumstances indicate Appellant did not receive a final accounting of pay. Although Appellant sometimes experienced significant disruptions in receiving his pay, at other times he received his pay as scheduled. Moreover, there was general agreement among those familiar with Appellant's situation—including his own defense team—that Appellant *should* be receiving pay, and efforts were made by his first sergeant, the legal office, and finance personnel to facilitate those payments. Most tellingly, Appellant never completed out-processing from his unit or Creech AFB. To the contrary, he continued to report for duty, to perform duties as directed, and to receive and acknowledge annual performance reports.

Because "one or more of these criteria have not been fully met," we "consider the totality of the circumstances in making a jurisdictional determination." *Christensen*, 78 M.J. at 5 n.6 (citation omitted). We find the totality of the circumstances indicate Appellant was not fully discharged from the Air Force. Appellant evidently believed he was still in the Air Force. His defense counsel, both by advocating for his receipt of pay and by telling the military judge there were "no concerns" with Appellant's continued service beyond the expiration of his original term of service, indicated they believed Appellant was still in the Air Force. The Prosecution and Appellant's command evidently believed he was still in the Air Force. Notwithstanding the apparent inefficiencies in the Air Force personnel and military finance systems, or Appellant's ability to obtain a DD Form 214, this is not a situation where reason or policy dictates a conclusion that Appellant had been discharged for purposes of jurisdiction. *Cf. Christensen*, 78 M.J. at 5 (finding the military did not retain jurisdiction despite no final accounting of pay where, *inter alia*, appellant's "command treated [him] as a civilian" for months and "[a]ppellant held an objectively reasonable belief that he was no longer in the Army"); *Nettles*, 74 M.J. at 292 (finding no personal jurisdiction despite no physical delivery of DD Form 214 to reservist appellant where an applicable statute specified the separation date).

## B. Expert Testimony

### 1. Additional Background

At an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing before the court members arrived, the Defense orally moved to preclude the Government's expert in forensic toxicology, Dr. CS, from testifying "with respect to retrograde extrapolation or anterograde extrapolation" as to Appellant's likely BAC at relevant points in time on the morning of 3 May 2019. Civilian trial defense counsel contended Dr. CS's anticipated methods were "unreliable and not accepted by the relevant scientific community." He further contended the testimony should also be excluded under Military Rule of Evidence (Mil. R. Evid.) 403 due to "confusion to the members and misleading the members with respect to the science, and the assumptions, and variables necessary for this expert to perform these calculations." The Government opposed the motion.

The Defense called Dr. CS to testify for purposes of the motion. Dr. CS was a forensic toxicologist with 35 years of experience in the field. He explained the difference between retrograde extrapolation and anterograde extrapolation, as applied in Appellant's case. In short, retrograde extrapolation used Appellant's measured BAC of 0.029 at 1041 to calculate Appellant's BAC at earlier points in time, based on certain other data including Appellant's size, sex, age, information regarding his prior alcohol consumption, and certain assumptions accepted within the scientific community as to how quickly a human body

removes alcohol from the bloodstream. Anterograde extrapolation used information regarding how much alcohol Appellant was known to have consumed over a period of time, coupled with information regarding Appellant's size, sex, age, and scientifically based assumptions regarding how the human body distributes and metabolizes alcohol, to estimate Appellant's BAC at points in time after he finished his last drink at the bar around 0411. In other words, Dr. CS's retrograde extrapolation was a backward-looking analysis based on a known BAC measure; his anterograde extrapolation was a forward-looking analysis based on information regarding how much alcohol Appellant was known to have consumed over a certain period of time.

Testifying for the defense motion, Dr. CS explained the data and methods he used in both types of analyses. He explained his analyses resulted in different ranges for Appellant's BAC at 0415 and 0515 (points in time when Appellant was driving his truck and later his girlfriend's vehicle) depending on different variables he applied, derived from the information he was provided about the case. For example, Dr. CS used two different estimated strengths for the liquor shots Appellant consumed, which affected the anterograde extrapolations.

Civilian trial defense counsel elicited that Dr. CS was aware a toxicologist employed by the Las Vegas Metropolitan Police Department Toxicology Lab was not willing to perform a retrograde extrapolation as to Appellant's BAC at 0415, around the time when Appellant's truck struck FM. Dr. CS believed this was because the police toxicologist believed at 0415 Appellant would still have been absorbing alcohol into his bloodstream from his most recent drinks at the bar, meaning his BAC could have been rising even after the accident. Dr. CS also acknowledged two authoritative references in the forensic science and toxicology communities which advised a retrograde extrapolation should not be performed when the individual is still absorbing alcohol into their system. However, Dr. CS testified that "many toxicologists" had taught that a retrograde extrapolation could still be performed when the individual was in the absorption phase, "with appropriate precautions on the interpretation for use on that data," although he did not identify any specific source to support this contention. Dr. CS further testified he had made retrograde calculations for Appellant's BAC at 0415 and would be able to testify regarding them if requested to do so.[4]

Dr. CS also acknowledged his calculations relied on certain assumptions based on average values for how rapidly humans metabolize alcohol and how alcohol is distributed within the human body. Because Appellant's specific

---

[4] Continued absorption of alcohol was evidently not a material concern with respect to retrograde extrapolation of Appellant's BAC at 0515.

rates of metabolism and distribution might vary somewhat from the averages, the true BAC values in Appellant's case could deviate somewhat as a result. For this and other reasons, Dr. CS presented his extrapolations as ranges of estimated values, rather than a single estimated figure.

On cross-examination by trial counsel, Dr. CS explained that some variability in test results is expected and taken into account in his extrapolations. He further testified that Appellant's case provided more evidence in the form of known values, including a BAC measurement coupled with an exact timeline of Appellant's drinking behavior, than 99 percent of other cases he had evaluated in over 30 years as a toxicologist. Dr. CS also testified that anterograde extrapolation was a widely accepted technique in the scientific community, and that he had all the data he needed to make valid anterograde extrapolations in this case. Dr. CS further explained that he had calculated the anterograde extrapolation for the 0415 collision without including the last two drinks Appellant consumed at the bar, because they would not have been fully absorbed at the time Appellant's truck struck FM. He further testified that retrograde extrapolation was a technique generally accepted in court systems around the world, and that performing retrograde extrapolation based on one BAC measurement was a generally accepted practice. Dr. CS explained the fact that the calculated values from the retrograde and anterograde extrapolations "overlap[ped] in a substantive way" reinforced his confidence that the calculations were accurate.

After Dr. CS testified, the military judge received argument from counsel on the motion. Civilian trial defense counsel did not contend that retrograde and anterograde extrapolation *in general* were not accepted methodologies in the scientific community. Instead, he focused on Dr. CS's retrograde extrapolation specifically as to the 0415 collision, contending that such an extrapolation at a point when Appellant was still in the alcohol absorption phase was "absurd" and not generally accepted in the scientific community. Civilian trial defense counsel then argued that all of the retrograde and anterograde extrapolation testimony should be excluded because the various BAC estimates for the two events, in light of the significant variables involved, made the testimony "so unreliable, so confusing, and misleading that it should not be allowed in based on [Mil. R. Evid.] 403."

After an overnight break, the military judge issued an oral ruling on the defense motion. The military judge reiterated relevant points from Dr. CS's testimony in her findings of fact. She then stated the applicable law, including *inter alia* Mil. R. Evid. 702, *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The military judge found "the science of retrograde and anterograde extrapolation can be reliable in a given case." With regard to the defense objection to

Dr. CS using retrograde extrapolation during the absorption phase, the military judge found the expert was aware Appellant was in the absorption phase at 0415 and accounted for it by not including the final two drinks Appellant consumed in his anterograde extrapolation for 0415. The military judge further found Dr. CS based his calculations on "sufficient facts and data in this case," including: when Appellant had his last drink; evidence of Appellant's blood samples; Appellant's gender, age, and body size; the amount and type of alcohol Appellant consumed; the time in which each drink was consumed; and Appellant's food intake. The military judge further found retrograde and anterograde extrapolation had been tested in the relevant scientific community—forensic toxicologists; there was a known error rate; and the techniques had been peer reviewed and published. She further concluded the probative value of Dr. CS's testimony outweighed the dangers of unfair prejudice, confusion of the issues, or misleading the members, and noted the Defense could cross-examine Dr. CS to expose the limitations of his testimony which went to its weight rather than its admissibility. She concluded the objection was overruled and Dr. CS could testify regarding both retrograde and anterograde extrapolation.[5]

The Government called Dr. CS to testify during findings. Without objection, the military judge recognized him as an expert in forensic toxicology. Dr. CS testified regarding his retrograde extrapolation of Appellant's BAC at 0515, and his anterograde extrapolation of Appellant's BAC at both 0415 and 0515. Significantly, Dr. CS did not present his retrograde extrapolation of Appellant's BAC at 0415, during the absorption phase, which was the primary focus of civilian trial defense counsel's questioning and argument during the motion hearing.

**2. Law**

A military judge's decision to admit or exclude expert testimony is reviewed for an abuse of discretion. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *Id.* (citation omitted). "For [a] ruling to be an abuse of discretion, it must be 'more than a mere difference of opinion'; rather, it must be 'arbitrary, fanciful, clearly unreasonable' or 'clearly erroneous.'" *United States v. Collier*,

---

[5] The military judge did grant a defense request to require Dr. CS to refrain from using certain short-hand terminology to refer to certain sets of calculations with particular parameters. The Defense had objected that these terms were unfairly prejudicial to Appellant. The details of this minor limitation on Dr. CS's testimony are not relevant to our opinion.

67 M.J. 347, 353 (C.A.A.F. 2009) (quoting *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (additional citations omitted)).

Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; [(b)] the testimony is based on sufficient facts or data; [(c)] the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The CAAF has articulated six factors for military courts to analyze to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *Houser*, 36 M.J. at 397). Though *Houser* predates the leading United States Supreme Court decisions in this area, *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), *Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Billings*, 61 M.J. at 166 (citations omitted).

However, "while satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007). The military judge's inquiry is "flexible" and "tied to the facts of [the] particular case." *Id*. (citations omitted).

The military judge may exclude relevant evidence that is otherwise admissible if its probative value is substantially outweighed by a countervailing concern, including, *inter alia*, unfair prejudice, confusion of the issues, or misleading the members. Mil. R. Evid. 403. "A military judge enjoys 'wide discretion' in applying Mil. R. Evid. 403." *United States v. Harris*, 46 M.J. 221, 225 (C.A.A.F. 1997) (citation omitted). "When a military judge conducts a proper balancing test under Mil. R. Evid. 403, the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166

(C.A.A.F. 2000) (quoting *United States v. Ruppel*, 49 M.J. 247, 250 (C.A.A.F. 1998)).

### 3. Analysis

On appeal, Appellant's argument is essentially the same as that made by the Defense at trial. He does not contest that, as a general matter, retrograde and anterograde extrapolation of BAC are valid techniques accepted in the relevant scientific community. However, he contends the application of retrograde extrapolation to Appellant at 0415 on 3 May 2019, when Appellant was still absorbing alcohol into his system, was contrary to the weight of the authorities cited by civilian trial defense counsel and conceded by Dr. CS, and further illustrated by the Las Vegas police forensic toxicologist's unwillingness to perform such a calculation. Appellant implies, but does not clearly explain, why the probative value of the other three extrapolations—retrograde extrapolation as to 0515, and anterograde extrapolation as to 0415 and 0515—is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members.

We do not find the military judge abused her discretion. Appellant does not specifically challenge the military judge's findings of fact, and we find her material findings are supported by the evidence. Similarly, Appellant does not contend the military judge applied incorrect legal principles, and we find she cited the correct ones. Accordingly, the issue becomes whether the military judge's application of the law to the facts was arbitrary, fanciful, clearly unreasonable, or clearly erroneous. We find it was not.

The military judge could reasonably conclude Dr. CS's testimony regarding retrograde and anterograde extrapolations for both 0415 and 0515 satisfied the criteria expressed in Mil. R. Evid. 702, *Houser*, and *Daubert*. At trial and on appeal, the Defense has not presented a cogent argument as to why the retrograde extrapolation for 0515 or either of the anterograde extrapolations were scientifically unreliable. The Defense has focused its attention on the retrograde extrapolation for 0415, mustering evidence that at least some forensic toxicologists would consider such a calculation during the absorption phase inadvisable. However, given Dr. CS's expertise, his awareness of the uncertainty created by Appellant's continued absorption of alcohol after 0415, and the apparent soundness of the science of retrograde extrapolation in general, the military judge acted within her discretion to conclude the limitations on retrograde extrapolation were matters of weight rather than admissibility that could be developed through cross-examination, as appropriate. Similarly, we do not find the military judge abused her discretion by finding the probative value of all four extrapolations was not substantially outweighed by countervailing concerns under Mil. R. Evid. 403.

Assuming for purposes of argument that the military judge did abuse her discretion with respect to the 0415 retrograde extrapolation—the focus of the Defense's objection—we find the error was harmless. Although the military judge ruled Dr. CS could offer such testimony, the Government—presumably for tactical reasons—elected not to elicit that testimony from Dr. CS before the court members. Accordingly, it had no effect on the findings of guilty and did not materially prejudice Appellant's substantial rights.

## C. Legal and Factual Sufficiency

### 1. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted), *rev. denied*, 82 M.J. 312 (C.A.A.F. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

"[T]he [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted).

In order to convict Appellant of involuntary manslaughter by culpable negligence in violation of Article 119, UCMJ, the Government was required to prove: (1) FM is dead; (2) FM's death resulted from Appellant striking him with a vehicle at or near Las Vegas on or about 3 May 2019; (3) the killing was unlawful; and (4) Appellant's act constituted culpable negligence. *See* 10 U.S.C. § 919(b); *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 57.b.(2). Culpable negligence "is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of that act or omission." *MCM*, pt. IV, ¶ 57.c.(2)(a)(i).

In order to convict Appellant of drunken operation of a vehicle in violation of Article 113, UCMJ, the Government was required to prove: (1) at or near Las Vegas on or about 3 May 2019, Appellant was in physical control of a vehicle; (2) Appellant controlled the vehicle while drunk; and, with respect to drunken operation of a vehicle causing injury, that Appellant thereby caused the vehicle to injure FM. *See* 10 U.S.C. § 913(a)(2); *MCM*, pt. IV, ¶ 51.b. "Drunk" means intoxication by alcohol "sufficient to impair the rational and full exercise of the mental or physical faculties." *MCM*, pt. IV, ¶ 51.c.(6).

In order to convict Appellant of wrongfully leaving the scene of an accident, the Government was required to prove: (1) on or about 3 May 2019 at or near Las Vegas, Appellant was the driver of a vehicle; (2) while Appellant was driving, the vehicle was involved in an accident that caused personal injury; (3) Appellant knew the vehicle had been in an accident; (4) Appellant left the scene of the accident without providing assistance to FM, who had been struck and injured by the vehicle; and (5) Appellant's leaving was wrongful. *See* 10 U.S.C. § 911(a); *MCM*, pt. IV, ¶ 48.b.(1).

### 2. Analysis

Appellant challenges the legal and factual sufficiency of his convictions for each of the contested specifications: involuntary manslaughter; drunken operation of a vehicle resulting in injury (Appellant's pickup truck) and not resulting in injury (Appellant's girlfriend's vehicle); and wrongfully leaving the scene of an accident. We address the offenses in turn.

#### a. Involuntary Manslaughter

The Government introduced sufficient evidence for a rational factfinder to find Appellant guilty of involuntary manslaughter beyond a reasonable doubt. The evidence was overwhelming and essentially uncontested that FM was dead and died as a result of being struck by the truck Appellant was driving. Moreover, Appellant had no lawful cause to kill FM. Accordingly, Appellant's guilt hinged on whether he had been culpably negligent. A rational factfinder could reasonably conclude that driving a truck while impaired by alcohol demonstrated a culpable disregard for the foreseeable consequences to others,

specifically, that the impaired driver might hit others on or near the road. Accordingly, Appellant's conviction rested on the Government's proof that Appellant was impaired at the time he struck FM with his truck, as well as other evidence Appellant was driving unsafely in a manner that created a foreseeable risk to others.

The Government provided substantial evidence that Appellant was impaired by alcohol. The Government introduced video recordings and Appellant's receipts from the bar that showed he consumed approximately 72 ounces of beer, four shots of liquor, and two mixed drinks between midnight and 0411 on 3 May 2019. Even if one considers that two of the drinks were not fully absorbed into Appellant's system when Appellant's truck struck FM around 0415, Appellant nevertheless had consumed a significant quantity of alcohol. The Government introduced expert testimony of Dr. CS, a forensic toxicologist who estimated, based on the available data, that Appellant's BAC at 0415 was between 0.10 and 0.12 grams per 100 milliliters. Dr. CS additionally presented evidence that individuals with a BAC in this range would experience, *inter alia*, sensory-motor impairment, diminished attention and judgment, loss of critical judgment, impairment of perception, and increased reaction times. The circumstances of the accident provide additional, circumstantial evidence Appellant was impaired and driving unsafely. Appellant struck FM near the center of an unobstructed crosswalk with clear fields of view. The Government introduced expert testimony by an accident reconstructionist, GP, who conservatively calculated that Appellant was traveling between 43.4 and 58 miles per hour in a 35-mile-per-hour zone when the collision occurred, with an actual speed likely "much higher" and "well in excess of 60 miles per hour" if GP had "considered everything." There was no evidence Appellant slowed or attempted to stop before striking FM, suggesting Appellant either did not see FM or was very slow to react. Although it was nighttime, three of the four street lamps at the intersection were operational, and Appellant's truck was equipped with headlights. Based on the evidence presented, a rational factfinder could reasonably conclude Appellant was impaired, significantly speeding, and inattentive when he struck FM with his truck, and therefore culpably negligent.

Appellant asserts other evidence indicates he was not actually impaired. For example, the bartender who served Appellant at the bar did not observe him slurring his words, stumbling, or otherwise evidently impaired. The video from the bar does not depict Appellant staggering or stumbling when he departed. Once Appellant arrived at his house after the collision, he was able to successfully back his truck into his driveway. Moreover, he was able to drive his girlfriend's vehicle some distance into the desert and back without apparent further incident. However, the military judge could nevertheless find this evidence did not substantially undermine the evidence of impairment described above.

Appellant also attacks the credibility of the Government expert witnesses. He notes Dr. SC, the forensic pathologist, changed his opinion between his interview by the defense team, when he stated he could not determine on which side of the body FM was hit, and his testimony, when he stated he believed FM was struck on the left side of his body. Appellant contends this shows Dr. SC's testimony was unreliable because he changed his purported opinion to align more closely with the Government's theory of which direction FM was walking in. However, a rational factfinder could reasonably find FM's direction of travel was of little significance. Whether he was walking from east to west or west to east, the evidence showed he was hit near the middle of the crosswalk. Either way, a rational factfinder could conclude FM was walking in the crosswalk for several seconds and should have been visible to Appellant before he was hit.

Appellant attacks the methodology and testimony of GP, the accident reconstructionist. For example, Appellant notes GP did not visit the scene of the accident at the same time of day that the accident occurred in order to assess the lighting conditions, did not inspect Appellant's truck, and did not adequately explain his belief that unmeasured factors led him to believe Appellant's actual speed was higher than the range his model estimated. Nevertheless, the military judge could reasonably conclude these points did not undermine the essential thrust of GP's testimony, including that Appellant was speeding and should have been able to see FM in the crosswalk.

Appellant also attacks the credibility of Dr. CS, the forensic toxicologist, referring back to his arguments regarding issue (2), the military judge's decision to permit Dr. CS's BAC calculations. Again, a rational factfinder could nevertheless find Dr. CS's testimony reliable and persuasive. In addition, as noted above, when Dr. CS testified before the court members he did not provide a retrograde BAC calculation with regard to the 0415 collision, which was the focus of much of the contention during the *Daubert* hearing.

A rational factfinder could also reasonably discount Appellant's remaining arguments with respect to involuntary manslaughter, which we do not find necessary to elaborate here. Drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's conviction for involuntary manslaughter. Additionally, having weighed the evidence in the record of trial, and having made allowances for the fact that the court members personally observed the witnesses and we did not, we also find the evidence factually sufficient.

### b. Drunken Operation of a Vehicle

Appellant was convicted of two specifications of drunken operation of a vehicle. One specification alleged Appellant controlled his pickup truck while drunk and thereby caused injury to FM. The discussion above regarding the

sufficiency of the evidence that Appellant was impaired at the time he hit FM generally applies to this specification as well. For similar reasons, a rational factfinder could conclude Appellant controlled his truck while drunk—that is, intoxicated by alcohol to a sufficient degree "to impair the rational and full exercise of the mental or physical faculties." *MCM*, pt. IV, ¶ 51.c.(6).

The evidence also supports finding Appellant guilty beyond reasonable doubt of the second specification—that he controlled his girlfriend's vehicle while drunk. Dr. CS testified that, unlike the 0415 collision with FM, while Appellant was driving the other vehicle at 0515 the final two drinks would have been fully absorbed. After applying both retrograde and anterograde analyses based on the available data, Dr. CS testified Appellant's BAC when he drove his girlfriend's vehicle was between 0.11 and 0.14 grams per 100 milliliters. Based on the evidence of the amount of alcohol Appellant consumed, Dr. CS's testimony regarding Appellant's BAC, and Dr. CS's testimony regarding the effects of alcohol, a rational factfinder could reasonably conclude beyond a reasonable doubt Appellant was drunk when he drove the second vehicle.

Accordingly, drawing every reasonable inference from the evidence of record in favor of the Government, we conclude the evidence was legally sufficient to support Appellant's convictions for drunken operation of a vehicle. Having weighed the evidence in the record of trial, and having made allowances for the fact that the court members personally observed the witnesses and we did not, we also find the evidence factually sufficient.

### c. Wrongfully Leaving the Scene of an Accident

With regard to leaving the scene of an accident, there was little dispute that Appellant operated a vehicle that was involved in an accident that injured FM, and that Appellant left the scene without providing assistance to FM. Appellant's departure from the scene was wrongful in the sense that he had no legal justification or excuse for doing so. Accordingly, the focus of contention for this offense was whether Appellant knew his truck had been in an accident that caused personal injury.

A rational factfinder could find beyond a reasonable doubt Appellant did know it. A1C WM testified that toward the end of the drive from the bar to Appellant's house, Appellant told A1C WM that Appellant might have hit "either something or someone." After trial counsel refreshed A1C WM's recollection with his prior written statement, A1C WM specifically testified Appellant had told A1C WM he "hit someone." A1C WM further testified Appellant did not stop and they continued to Appellant's house. Appellant emphasizes A1C WM's initial uncertainty as to what Appellant had said, and that on cross-examination A1C WM stated he was still "not sure" if Appellant said he hit

"somebody" or "something." Nevertheless, a rational factfinder could credit A1C WM's refreshed testimony that Appellant had said he hit someone. Moreover, such a factfinder could conclude Appellant's subsequent actions provided circumstantial evidence of his consciousness of guilt. That Appellant immediately attempted to clean the blood from his vehicle and returned to the scene in order to conceal evidence could suggest Appellant believed he hit a person rather than an animal.

Drawing every reasonable inference in favor of the Government, we find the evidence is legally sufficient to support Appellant's conviction for wrongfully leaving the scene of an accident. In addition, we find the evidence factually sufficient.

**D. Sentence Severity**

**1. Law**

We review issues of sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). We may affirm only as much of the sentence as we find correct in law and fact and determine should be approved on the basis of the entire record. Article 66(d), UCMJ, 10 U.S.C. § 866(d). "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Sauk*, 74 M.J. 594, 606 (A.F. Ct. Crim. App. 2015) (en banc) (per curiam) (alteration in original) (citing *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam)). Our sentence appropriateness review includes "considerations of uniformity and evenhandedness of sentencing decisions." *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citations omitted). Although we have "broad discretionary power to review sentence appropriateness," *United States v. Kelly*, 77 M.J. 404, 405 (C.A.A.F. 2018), we have no authority to grant mercy. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

CCAs are "not required . . . to engage in sentence comparison with specific [other] cases 'except in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). Cases are "closely related" when, for example, they involve "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared." *Id.* "[A]n appellant bears the burden of demonstrating that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.' If the appellant meets that burden . . . then the Government

must show that there is a rational basis for the disparity." *Id.*; *see also United States v. Durant*, 55 M.J. 258, 261–63 (C.A.A.F. 2001) (holding a highly disparate sentence in a closely related case did not warrant sentence relief where a rational basis for the difference existed). Although not required to do so, a CCA may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence. *United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001). However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283).

**2. Analysis**

Appellant contends his sentence to confinement for 14 years is inappropriately severe. He notes the military judge sentenced him to the maximum imposable term of confinement for four of the seven specifications of which he was convicted. Appellant contends he demonstrated sincere remorse as "evidenced by his plea of guilty to obstructing justice and conspiring to do the same," by his expressions of regret and sorrow in his unsworn statements to the court-martial, and by character statements presented at sentencing. He further argues his strong duty performance including three deployments warrants consideration. Additionally, Appellant compares his sentence to the lower sentences received by several other servicemembers convicted of vehicular involuntary manslaughter, as reported in opinions issued by this court and other CCAs. He requests a reduction in his term of confinement to a total of eight-and-a-half years.

With respect to comparing Appellant's sentence to those adjudged in other courts-martial, Appellant has not attempted to demonstrate any of those cases have a "direct nexus" or are in any other way closely related to his own, and we conclude that they are not related. *See Lacy*, 50 M.J. at 288. We find, moreover, Appellant has not demonstrated that an exception to the general rule against directly comparing sentences in non-closely related cases should apply in this case. *See LeBlanc*, 74 M.J. at 659. Accordingly, we decline to engage in such comparisons here.[6]

---

[6] The Government has not objected to our consideration of the cases Appellant cites on the grounds that they are outside the record of trial. *See Jessie*, 79 M.J. at 441–46 (C.A.A.F. 2020). In light of our conclusion that sentence comparison is not appropriate in this case, we decline to further address the application of *Jessie* to this issue. *Cf. Behunin*, 2023 CAAF LEXIS at *6 (assuming without deciding the CCA properly considered the entry of judgment from a separate court-martial); *United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021) (considering documents not included in or

With regard to the terms of confinement the military judge imposed for the various specifications, Appellant is correct that the military judge imposed the maximum term for several of them. Specifically, the military judge imposed ten years of confinement for involuntary manslaughter (the maximum); 18 months for drunken operation of a vehicle resulting in injury (the maximum, to run concurrently with the ten-year involuntary manslaughter term); six months for drunken operation of a vehicle not resulting in injury or property damage (the maximum); six months for leaving the scene of a vehicle accident (the maximum); and concurrent three-year terms for the conspiracy to obstruct justice specification and two obstruction of justice specifications. However, the military judge could reasonably conclude each of these offenses was significantly aggravated. Appellant's decision to drive after consuming a significant amount of alcohol over the course of more than four hours at a bar created the very foreseeable risk that he was a danger to others on and near the road, including pedestrians such as FM. Moreover, the evidence indicated Appellant was not only impaired, but speeding and inattentive at the point he struck FM in the middle of a crosswalk. Although Appellant expressed remorse at his court-martial, his evident priority after the accident was to avoid responsibility for his actions, including *inter alia* leaving the scene, conspiring with A1C WM to conceal evidence—which involved driving another vehicle with a passenger while still impaired, and making multiple false statements to the police. The military judge could reasonably conclude any mitigating or extenuating circumstances paled in comparison to the aggravating circumstances.

Furthermore, Appellant's assertion that "[a]fter merging certain offenses for sentencing, [Appellant] faced sixteen years of total confinement" is not entirely accurate. As a result of a defense motion regarding unreasonable multiplication of charges, the military judge ruled the involuntary manslaughter and drunken driving causing injury specifications would be merged for purposes of sentencing. *See generally United States v. Campbell*, 71 M.J. 19, 23 (C.A.A.F. 2012); *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001). However, the military judge was not required to have the conspiracy specification and two obstruction specifications run concurrently, and as a result Appellant's total exposure to confinement when he was sentenced was 26 years.

Having given individualized consideration to Appellant, the nature and seriousness of the offenses, Appellant's record of service, and all other matters contained in the record of trial, we conclude Appellant's sentence is not inappropriately severe.

---

attached to the record of trial "because neither party has objected to our consideration of them").

## III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court